NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0486n.06

Nos. 15-1403/1490

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 18, 2016
DEBORAH S. HUNT, Clerk

STAR INSURANCE COMPANY et al., )
 )
   **Plaintiffs-Appellants/** )
   **Cross-Appellees,** )
 )
v. )
 )
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, )
 )
   **Defendant-Appellee/** )
   **Cross-Appellant.** )
 )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

OPINION

Before: GUY, BOGGS, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** In 1999, Meadowbrook Insurance Group ("Meadowbrook")[1] and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") entered into a reinsurance agreement (the "Treaty"). The Treaty contained an arbitration clause. In 2007, National Union accused Meadowbrook of overbilling and started to withhold payment on claims. In 2011, Meadowbrook demanded that the parties arbitrate their dispute. Pursuant to the Treaty, Meadowbrook and National Union entered into arbitration before a three-member panel (the "Arbitration Panel").

Meadowbrook alleges that that arbitration, which culminated in a Final Award ordering Meadowbrook to pay National Union millions of dollars in damages, was fraught with

---

[1]The four insurance companies that are appellants/cross-appellees in this case—Star Insurance Company, Savers Property and Casualty Insurance Company, Ameritrust Insurance Corporation, and Williamsburg National Insurance Company—refer to themselves, collectively, as Meadowbrook. Meadowbrook Br. at 4.

misconduct. Meadowbrook draws particular attention to the fact that National Union's party arbitrator, Jonathan Rosen, communicated ex parte with National Union's attorney, Neal Moglin, while the arbitration was ongoing. National Union counters that Meadowbrook's allegations are meritless—the last-ditch attempts of a losing party trying to escape liability.

The district court sided with National Union. Although the district court initially granted an injunction halting the arbitration after Meadowbrook brought the Arbitration Panel's alleged misconduct to light, we dissolved that injunction on jurisdictional grounds, and remanded with instructions to dismiss without prejudice. After the Arbitration Panel issued a final award and Meadowbrook filed suit again in the district court, the district court denied Meadowbrook's request to conduct discovery, and entered an order confirming in part the Arbitration Panel's Interim Final Award and Final Award.

Meadowbrook appeals, arguing that the district court erred when it confirmed in part the Arbitration Panel's two awards. Meadowbrook additionally argues that the district court erroneously rejected its discovery request. National Union cross-appeals, taking issue with the district court's damages and prejudgment-interest calculations.

For the reasons set forth below, we **REVERSE** the district court's judgment confirming in part the Interim Final Award and Final Award and **VACATE** both awards.

## I. FACTS AND PROCEDURE

This case's history is complex, and the parties present dramatically different accounts of that history in their briefs. Still, some things are clear. Meadowbrook and National Union entered into the Treaty in 1999. Their arbitration commenced in 2011. Pursuant to two scheduling orders that the Arbitration Panel issued, Meadowbrook and National Union agreed to

2

terminate ex parte communications with members of the Arbitration Panel after filing their first pre-arbitration-hearing briefs. National Union filed its pre-hearing brief on June 14, 2013.

The Arbitration Panel issued an Interim Final Award in National Union's favor on July 23, 2013. That day, arbitrator Rosen communicated ex parte with National Union's attorney, Moglin. Rosen and Moglin spoke ex parte at least two more times: once on July 25, and again on August 7.

On September 12, 2013, the district court entered an order enjoining further arbitration proceedings. We dissolved the injunction on jurisdictional grounds and ordered dismissal of the case without prejudice until the Arbitration Panel issued a final award. The Arbitration Panel issued its Final Award—also in National Union's favor—on July 25, 2014.

Meadowbrook filed a new suit in federal court on July 25, 2014. On October 2, 2014, the district court denied Meadowbrook's request to conduct discovery into the Arbitration Panel's alleged misconduct. Then, on March 31, 2015, the district court confirmed in part the Arbitration Panel's Interim Final Award and Final Award. National Union moved to amend that confirmation order under Federal Rule of Civil Procedure 59(e), and the district court denied that motion on January 27, 2016.

## A. Facts

### 1. In 1999, National Union and Meadowbrook enter into a reinsurance agreement that contains a binding arbitration clause.

In March 1999, Meadowbrook and National Union entered into the Treaty. R. 31-17 (Treaty) (Page ID #1934).[2] Pursuant to the Treaty, National Union agreed to reinsure Meadowbrook's workers'-compensation insurance programs. *Id.* Arts. 1–2. (Page ID #1934).

---

[2]Unless otherwise noted, all record citations are to the district-court docket in *Star Insurance Company et al. v. National Union Fire Insurance Company of Pittsburgh, PA*, No. 2:14-cv-12915 (E.D. Mich.).

Put simply, the Treaty obligated Meadowbrook to cover the first $100,000 of any loss under those programs, at which point Meadowbrook could recover any additional loss—up to a $150,000 cap—from National Union. *Id.* Art. 2 (Page ID #1934).

The Treaty contained an arbitration clause: Article 21. *Id.* Art. 21 (Page ID #1942–43). Article 21 provided, in relevant part:

> . . . [A]ny dispute arising out of this Agreement . . . shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire. Any such arbitration shall take place in Southfield, Michigan, unless otherwise agreed, and shall be subject to the laws of the State of Michigan.

> The members of the board of arbitration shall be active or retired disinterested officials of the insurance or reinsurance companies . . . not under the control of either party to this Agreement. Each party shall appoint its arbitrator and the two arbitrators shall choose an umpire before instituting the hearing. . . . If the two arbitrators fail to agree upon the appointment of an umpire within 60 days after their nominations, each of them shall name three, of whom the other shall decline two and the decision shall be made by drawing lots.

> . . .

> The board shall make its decision with regard to the custom and usage of the insurance and reinsurance business. . . .

*Id.* (Page ID #1942–43).

### 2. In 2007, National Union accuses Meadowbrook of overbilling and refuses to pay Meadowbrook's claims, and in 2011 Meadowbrook demands that the parties arbitrate their dispute.

National Union claims that, sometime in 2007, it discovered that Meadowbrook had been overbilling. R. 12 (Br. In Support of Def.'s Mot. to Confirm Arbitration Awards at 5–6) (Page ID #452–53). In response, National Union refused to pay any of Meadowbrook's claims under the Treaty. R. 47 (3/31/15 Op. and Order at 1–2) (Page ID #4297).

The dispute lasted for years. In February 2011, Meadowbrook demanded that the parties enter into arbitration. R. 36-1 (Demand for Arbitration at 1) (Page ID #2297). Pursuant to

Article 21 of the Treaty, Meadowbrook and National Union selected party arbitrators.  R. 31-17 (Treaty Art. 21) (Page ID #1942).  Meadowbrook picked Rex Schlaybaugh, a mergers-and-acquisitions attorney.  Meadowbrook Br. at 9; Nat'l Union Br. at 11.  National Union selected Rosen, who has worked in the reinsurance industry—as a lawyer, arbitrator, and corporate executive—for decades.  R. 13-4 (4/19/11 Letter from National Union to Meadowbrook at 1–3) (Page ID #661–63).

Rosen and Schlaybaugh could not settle on an umpire.  R. 12 (No. 2:13-cv-13807) (9/12/13 Order at 3) (Page ID #413).  After drawing lots, they elected Thomas Greene, who has worked in the insurance and reinsurance industries since 1956.  R. 13-5 (Greene Resume) (Page ID #683); R. 12 (No. 2:13-cv-13807) (9/12/13 Order at 3) (Page ID #413).

### 3. After consulting Meadowbrook and National Union, the Arbitration Panel issues two scheduling orders, both of which provide that ex parte contacts should terminate after the parties file their opening briefs.

The Arbitration Panel—Greene, Schlaybaugh, and Rosen—met with counsel for Meadowbrook and National Union at an organizational meeting on August 1, 2012.  R. 9-2 (Organizational Meeting Tr.) (Page ID #344).  During the meeting, the Arbitration Panel and counsel for the parties discussed instituting a ban on ex parte communications.  Moglin suggested that ex parte communications "cease with the submission of the first brief."  *Id.* at 7 (Page ID #350).  After that point, Moglin said, "the curtain would fall."  *Id.* at 8 (Page ID #351).  Meadbowbrook's counsel, Douglas Young, responded that Moglin's proposed cutoff date might be too early; Young was concerned that the Arbitration Panel might have questions for the parties after they submitted their initial pre-hearing briefs.  *Id.*  Rosen assured him that that would not occur:  "That wouldn't happen.  That never happens. . . .  I'd never call you."  *Id.*

5

Ultimately, the Arbitration Panel "ruled that ex parte communication[s would] cease with the filing of the initial brief." *Id.* at 8 (Page ID #351).

On August 21, 2012, the Arbitration Panel issued a Scheduling Order, which provided: "*Ex parte* communications with any member of the [Arbitration] Panel shall cease upon the filing of the parties' initial pre-hearing briefs." R. 31-18 (Scheduling Order at 5) (Page ID #1959); *see* R. 13-18 (Meadowbrook Emergency Mot. to Stay at 2) (Page ID #868). On March 11, 2013, the Arbitration Panel issued a First Amended Scheduling Order that imposed an identical ban on ex parte communications. R. 31-19 (First Amend. Scheduling Order at 4) (Page ID #1965); *see* R. 13-18 (Meadowbrook Emergency Mot. to Stay at 2) (Page ID #868). Neither the Scheduling Order nor the First Amended Scheduling Order stated when—or whether—ex parte communications could resume.

**4. In its pre-hearing briefs, National Union demands $1,584,113.96 in damages plus interest.**

On July 27, 2012—over a year before filing its pre-hearing brief—National Union filed a Preliminary Statement that outlined, broadly, its claims in the arbitration. R. 41-14 (Nat'l Union Preliminary Statement) (Page ID #3848). In a section titled "Relief Requested," National Union did not identify a specific damages figure, but instead wrote:

National Union seeks an Order from this Panel:

. . .

Requiring Meadowbrook to return to National Union all amounts improperly collected from National Union under the Treaty from inception through the date of this submission;

Requiring Meadowbrook to pay interest on all such improperly collected amounts at a rate sufficient to compensate National Union for the lost use of those funds; and

Granting such other and further relief as this Panel deems appropriate.

*Id.* at 3 (Page ID #3850). National Union concluded its Preliminary Statement as follows: "National Union reserves the right to amend its request for relief as appropriate if, in the course of this arbitration, additional facts or issues come to light." *Id.* at 4 (Page ID #3851).

In its June 14, 2013 Pre-Hearing Submission (i.e., its first pre-hearing brief), National Union narrowed considerably the relief it was seeking. R. 41-9 (National Union Pre-Hr'g Submission at 51–52) (Page ID #3410–11). There, National Union alleged that Meadowbrook had overbilled National Union by $1,584,113.96. *Id.* at 52 (Page ID #3411). National Union sought damages in that amount, plus at least $1,950,680.48 in interest. *Id.*

In its June 28, 2013 Pre-Hearing Reply Submission, National Union appeared to clarify that Meadowbrook had overbilled for losses that it incurred through *six* of its workers'-compensation programs. R. 41-10 (National Union Pre-Hr'g Reply Submission at 30) (Page ID #3443). By Meadowbrook's reading, in that document National Union took the position that $1,584,113.96 (plus interest) set the outer limit of Meadowbrook's damages liability—i.e., that National Union was seeking damages for Meadowbrook's overbilling in relation to six programs, and *only* those six programs. *See, e.g.*, Meadowbrook Br. at 9–11. National Union, in contrast, argues that it never confined its damages request to those six workers'-compensation programs. *See, e.g.*, Nat'l Union Br. at 12–13.

**5. After the Arbitration Panel issues an Interim Final Award in National Union's favor on July 23, 2013, Rosen and Moglin commence their ex parte communications.**

The arbitration hearing began in mid-July 2013. *See* R. 13-12 (7/16/13 Arbitration Hr'g Tr.) (Page ID #750). In its closing argument, National Union urged the Arbitration Panel to adopt one of two Proposed Orders. R. 13-13 (7/18/13 Nat'l Union Closing Slides at 62–63)

7

(Page ID #816–17). "Version One" tracked the relief that National Union requested in its June 14, 2013 Pre-Hearing Submission: National Union demanded $1,584,113.96 in damages and $1,950,680.48 in interest. *Id.* at 62 (Page ID #816). Version One also contained the following provision: "[T]he Panel declares that National Union is not liable for any program in which Meadowbrook has produced in this Arbitration insufficient contemporaneous documentation to allow National Union to verify the percentage of the retained risk reported by Meadowbrook." *Id.* Finally, National Union requested to be reimbursed "for its attorneys' fees and all costs associated with th[e] Arbitration." *Id.* National Union's other Proposed Order—"Version Two"—sought considerably broader relief: "full rescission" of the Treaty. *Id.* at 63 (Page ID #817).

On July 23, 2013, the Arbitration Panel issued an Interim Final Award. R. 13-1 (7/23/13 Interim Final Award) (Page ID #499). The Arbitration Panel found for National Union, and effectively adopted Version One of its Proposed Order. *Id.* In Paragraph Three of the Interim Final Award, the Arbitration Panel ordered Meadowbrook to pay National Union $1,584,113.96, plus $1,950,680.48 in interest; those figures, the Arbitration Panel wrote, were "capable of immediate computation." *Id.* at 1–2 (Page ID #499–500). However, in Paragraph Four of the Interim Final Award, the Arbitration Panel added a caveat that held the potential to expand dramatically Meadowbrook's liability:

> Notwithstanding the ruling . . . above, the [Arbitration] Panel declares that National Union is not liable for any program in which Meadowbrook has produced in this Arbitration insufficient documentation to allow National Union to verify the percentage of the retained risk reported by Meadowbrook. Meadowbrook is ordered to prepare within fourteen days a list of all programs and provide all supporting documentation with respect to the program and retained risk . . . . Any dispute over such retained risk and supporting documentation will be adjudicated by the [Arbitration] Panel.

*Id.* at 2 (Page ID #500).

The day the Arbitration Panel issued the Interim Final Award—July 23, 2013—Moglin and Rosen communicated ex parte. R. 13-18 (Meadowbrook Emergency Mot. to Stay, Ex. B—Moglin Timesheets ("Moglin Timesheets") at 1) (Page ID #880). The two discussed the Interim Final Award. *Id.* Moglin and Rosen spoke again, for a half-hour, on July 25. *Id.* at 2 (Page ID #881).

> **6. After Meadowbrook files a supplemental brief pursuant to Paragraph Four of the Interim Final Award, Rosen and Moglin again communicate ex parte, and days later Rosen and Greene—but not Schlaybaugh—issue an order striking that supplemental brief.**

Over the course of one week in August 2013, Greene and Rosen issued two orders without first hearing from Schlaybaugh, who was on vacation in northern Canada. Emails were sent and missed; wires were crossed. In between, arbitrator Rosen and attorney Moglin communicated ex parte.

*August 6, 2013*: Pursuant to the Arbitration Panel's directive in Paragraph Four of the Interim Final Award, Meadowbrook filed a supplemental brief on August 6, 2013. R. 44-1 (8/6/13 Meadowbrook Supp. Br.) (Page ID #4178). In this supplemental brief, Meadowbrook purported to "address[] two categories of claim recoveries Meadowbrook believe[d] the [Arbitration] Panel awarded Meadowbrook." R. 44-1 (11/6/14 Meadowbrook's Supp. Br. at 2) (Page ID #4179).

*August 7, 2013*: One day later—August 7—Moglin and Rosen resumed their ex parte communications. R. 13-18 (Moglin Timesheets at 3) (Page ID #882). That day, Moglin and Rosen conducted an "extended telephone conference." *Id.*

9

*August 9, 2013*: On August 9, National Union filed an emergency motion to strike Meadowbrook's August 6 supplemental brief and to compel Meadowbrook to comply with the Arbitration Panel's Interim Final Award. R. 9-3 (8/9/13 Nat'l Union Mot. to Strike at 1) (Page ID #363). National Union explained that, in its view, "time is very much of the essence here since National Union wants to adhere to the schedule set by the [Arbitration] Panel (which requires a substantive response from National Union by August 20th)." *Id.* Accordingly, National Union requested that the Arbitration Panel:

> . . . [I]ssue a ruling . . . [o]rdering that by no later than August 13, 2013, Meadowbrook shall comply with Paragraph 4 of the Interim Final Award by providing to the [Arbitration] Panel and National Union a detailed list of all programs (and not merely those with outstanding balances) and all supporting documentation with respect to such programs produced by Meadowbrook in discovery in this arbitration proceeding that refer or relate to the percentage of risk alleged to have been retained by Meadowbrook.

*Id.* at 8 (Page ID #370).

About three hours after National Union submitted its August 9 motion to strike, Rosen emailed Schlaybaugh and Greene. R. 13-2 (Final Award, App., Ex. J—8/9/13 Panel Emails) (Page ID #557). Rosen requested that the Arbitration Panel "speak as soon as possible about the substance of" the motion to strike Meadowbrook's brief. *Id.* Rosen added that he "was appalled" by Meadowbrook's apparent attempt to introduce new documents and "seek relief that was clearly not part of or contemplated by" the Interim Final Award. *Id.*

Schlaybaugh, however, did not receive Rosen's email—at least not right away. The same day that National Union filed its motion to strike, August 9, Schlaybaugh left for a sailing trip to Canada. R. 31-12 (10/6/14 Schlaybaugh Dec. ¶ 5) (Page ID #1875). Before departing, Schlaybaugh instructed his assistant "to respond to any time-sensitive emails to inform the writer that" Schlaybaugh would be out of contact during his vacation. *Id.* ¶ 6 (Page ID #1875).

Greene responded to Rosen's email on August 9, writing that he would be available for a conference call "tomorrow, Sunday and Monday." R. 13-2 (Final Award, App., Ex. J—8/9/13 Panel Emails) (Page ID #557).

*August 10, 2013*: On August 10, Greene sent a group text message to Schlaybaugh and Rosen, asking Schlaybaugh if he would be available for a conference call on August 10, 11, or 12. R. 13-12 (Final Award, App., Ex. K—8/10/13 Text Message from Greene to Rosen and Schlaybaugh) (Page ID #560). Meadowbrook asserts in its brief that the phone number to which Greene sent that text message "is neither Schlaybaugh's cell phone number . . . nor his work number." Meadowbrook Br. at 18 n.6.

*August 12, 2013*: On August 12, Schlaybaugh's assistant emailed Rosen and Greene. R. 13-2 (Final Award, App., Ex. J—8/9/13 Panel Emails) (Page ID #557). She wrote: "Rex asked me to let you know that he is in remote parts of Northern Canada with at best intermittent cell or data availability through [August 15] so will be unable to connect with you by phone till later in the week." *Id.* Later that day, Schlaybaugh contacted his assistant, who told Schlaybaugh that she had informed Rosen and Greene that Schlaybaugh would be unavailable "from August 9 through mid-week of August 12." R. 31-12 (10/6/14 Schlaybaugh Dec. ¶ 7) (Page ID #1875).

About one hour after Schlaybaugh's assistant emailed Rosen and Greene to tell them that Schlaybaugh was out of the country, Rosen emailed Greene a draft order granting National Union's August 9 motion to strike. R. 13-2 (Final Award, App., Ex. L—8/12/13 Email from Rosen to Greene) (Page ID #562). Rosen did not copy Schlaybaugh on that email. *Id.* Rosen's proposed order also modified Paragraph Four of the Interim Final Award to clarify that

11

Meadowbrook was obligated to produce documents regarding *all* of the programs that the Treaty covered:

> . . . Meadowbrook is ordered to comply with Paragraph 4 of the Interim Final Award by providing the [Arbitration] Panel and National Union by no later than August 14, 2013 with a list of all programs (and not merely those with outstanding balances) and all supporting documentation with respect to such programs produced by Meadowbrook in discovery in this arbitration proceeding that refer or relate to the percentage of risk alleged to have been retained by Meadowbrook.

*Id.* Rosen also asked Greene to send an email to Schlaybaugh stating that unless Schlaybaugh responded "by close of business" on August 12, Rosen and Greene would issue Rosen's proposed order. *Id.*

Greene emailed Schlaybaugh on August 12. R. 13-2 (Final Award, App., Ex. M—8/12/13 Email from Greene to Schlaybaugh) (Page ID #564). Schlaybaugh did not immediately respond.

That same day—August 12—Greene issued an order granting National Union's August 9 motion to strike and ordering Meadowbrook "to comply with Paragraph 4 of the Interim Final Award . . . by no later than August 14, 2013." R. 13-2 (Final Award, App., Ex. Q—8/12/13 Order) (Page ID #582). Greene signed that order: "For the Panel." *Id.*

*August 13, 2013*: On August 13, Meadowbrook filed an Emergency Motion for Clarification and Additional Time to Respond. R. 13-2 (Final Award, App., Ex. R—8/13/13 Meadowbrook Mot.) (Page ID #584). Rosen emailed Greene and Schlaybaugh with a proposed order denying Meadowbrook's motion for clarification, but granting Meadowbrook time to respond to the August 12 order. R. 13-2 (Final Award, App., Ex. S—8/13/13 Email from Rosen to Panel) (Page ID #589). Greene—again, without hearing any input from Schlaybaugh—issued an order consistent with Rosen's email; the order directed Meadowbrook to comply with the

Arbitration Panel's August 12 order by August 19, 2013. R. 13-2 (Final Award, App., Ex. T—8/13/13 Order) (Page ID #592). Like the August 12 order, Greene signed the August 13 order: "For the Panel." *Id.*

## B. Procedural History

### 1. Meadowbrook files suit in Michigan state court, and unsuccessfully moves the Arbitration Panel to reconsider its August 12 order striking Meadowbrook's supplemental brief.

On August 13, 2013, Meadowbrook filed a complaint against National Union in Michigan's Oakland County Circuit Court. R. 1-2 (No. 2:13-cv-13807) (Meadowbrook State-Court Compl.) (Page ID #7). Meadowbrook argued, *inter alia*, that that court should vacate entirely the Arbitration Panel's Interim Final Award. *Id.* at 3–4 (Page ID #9–10). In support, Meadowbrook wrote that it had recently learned that while the arbitration was pending, Rosen and Moglin sat on a panel at a presentation at Moglin's law office. *Id.* at 5–6 (Page ID #11–12). Thus, Meadowbrook argued, the Arbitration Panel's Interim Final Award was "the product of evident partiality," and thus void under Michigan Court Rule 3.602(J). *Id.* at 3, 6 (Page ID #9, 12).

About a week later—on August 19, 2013—Meadowbrook filed with the Arbitration Panel a "Motion for Reconsideration of Panel's 8-12-2013 Decision." R. 13-2 (Final Award, App. Ex. V—8/19/13 Mot. for Reconsideration) (Page ID #598). That same day, Meadowbrook also circulated a response to the Arbitration Panel's August 13 order. R. 41-23 (8/19/13 Meadowbrook Response) (Page ID #3970).

**2. After discovering that Rosen and Moglin had communicated ex parte, Meadowbrook files an unsuccessful emergency motion to stay further arbitration proceedings, but that motion draws a lengthy dissent from Schlaybaugh.**

Because the Interim Final Award provided that National Union could recover costs and attorney's fees from Meadowbrook, National Union submitted a bill of costs on August 12, 2013. R. 13-1 (7/23/13 Interim Final Award ¶ 5) (Page ID #500); Meadowbrook Br. at 21. Moglin attached timesheets to that bill of costs—and those timesheets contained several entries confirming that Moglin and Rosen had communicated ex parte after National Union filed its June 14 Pre-Hearing Submission. R. 13-18 (Moglin Timesheets at 1–3) (Page ID #880–82).

On August 21, 2013, Meadowbrook filed with the Arbitration Panel an Emergency Motion to Stay All Proceedings. R. 13-18 (Meadowbrook Emergency Mot. to Stay) (Page ID #867). Meadowbrook argued that, under Michigan law, the "impermissible *ex parte* communications" between Rosen and Moglin "taint[ed] th[e] Panel beyond remediation, and w[ould] most likely necessitate vacating the Interim Final Award." *Id.* at 2 (Page ID #868). Meadowbrook asked the Arbitration Panel to stay further proceedings so Meadowbrook could investigate the full extent of Rosen's ex parte contacts. *Id.* at 6 (Page ID #872).

On August 29, 2013, Greene issued an order that (1) denied Meadowbrook's August 21 motion to stay; (2) denied Meadowbrook's August 19 reconsideration motion, and (3) granted National Union's August 12 bill of costs. R. 13-2 (Final Award, App., Ex. W—8/29/13 Order at 1–2) (Page ID #609–10). In that order, Greene rejected Meadowbrook's claim that Rosen's ex parte contacts with Moglin constituted grounds to stay the arbitration: "A review of the Organizational Meeting transcript and Scheduling Orders entered in connection with this proceeding readily establish that the prohibition on *ex parte* contact came to an end upon the

[Arbitration] Panel ruling on the merits of this dispute" (i.e., when the Arbitration Panel issued the Interim Final Award). *Id.* at 1–2 (Page ID #609–10).

The next day—August 30—Schlaybaugh filed a five-page dissent from the August 29 order. R. 31-6 (8/30/13 Schlaybaugh Dissent) (Page ID #1814). Schlaybaugh began by writing that "the Majority"—i.e., Greene and Rosen—"ha[d] erred in their conclusion that no impermissible communications have occurred." *Id.* at 1 (Page ID #1814). Schlaybaugh added: "The parties negotiated not one but two Scheduling Orders both of which contained expressed prohibitions on ex parte communications after Prehearing Briefs were filed. Nothing could be clearer about what the parties' intentions were at the time." *Id.* at 3 (Page ID #1816). As for the August 29 order's conclusion that the parties' ex parte-communications ban ended after the Arbitration Panel issued its Interim Final Award, Schlaybaugh wrote that such an interpretation was inconsistent with both scheduling orders. *Id.*

On September 3, 2013, Greene circulated an email addressing Schlaybaugh's August 30 dissent. R. 13-2 (Final Award, App., Ex. X—9/3/13 Greene Email) (Page ID #612). Regarding Rosen's ex parte contacts with Moglin, Greene wrote that both the Scheduling Order and the First Amended Scheduling Order "only contemplated an ex parte preclusion until the conclusion of the [arbitration] hearing." *Id.* at 2 (Page ID #613).

3. **National Union files a brief seeking $25,012,671.51 in damages and removes Meadowbrook's state-court suit to the Eastern District of Michigan, where Meadowbrook obtains an injunction staying the arbitration.**

National Union responded to Meadowbrook's August 19 submission on September 4, 2013. R. 41-21 (9/4/13 Nat'l Union Br.) (Page ID #3923). National Union argued that after reviewing Meadowbrook's August 19 brief, it had concluded that there were *sixteen* workers'-

compensation programs for which Meadowbrook had overbilled National Union.  *Id.* at 8 (Page ID #3930).  In total, National Union sought to recover $25,012,671.51 in damages as a result of this overbilling.  *Id.*

Two days later—on September 6, 2013—National Union removed Meadowbrook's state-court suit to the Eastern District of Michigan.  R. 1 (No. 2:13-cv-13807) (Def.'s Pet. for Removal) (Page ID #1).  On September 10, 2013, Meadowbrook filed a motion for a temporary restraining order and preliminary injunction in the district court.  R. 4 (No. 2:13-cv-13807) (Mot. for TRO and Prelim. Inj.) (Page ID #61).  In a brief accompanying that motion, Meadowbrook recounted what it had learned in the preceding weeks—namely, that Rosen and Moglin had communicated ex parte and that Greene and Rosen had issued two orders without Schlaybaugh's input.  R. 4 (No. 2:13-cv-13807) (Br. in Support of Mot. for TRO and Prelim. Inj. at 3–10) (Page ID #68–75).  Meadowbrook requested that the district court enjoin Greene and Rosen from engaging in any further proceedings.  *Id.* at 24 (Page ID #89).

The district court issued an order granting Meadowbrook's motion for injunctive relief on September 12, 2013.  R. 12 (No. 2:13-cv-13807) (9/12/13 Order) (Page ID #411).  The district court first concluded that it had jurisdiction to grant the injunction, because the essence of Meadowbrook's claim concerned an alleged breach of a contract provision:  Article 21 of the Treaty.  *Id.* at 7–9 (Page ID #417–19).  Turning to the merits of Meadowbrook's motion, the district court reasoned that Meadowbrook had raised legitimate concerns about Rosen's partiality, and that Rosen's ex parte contacts with Moglin appeared to have violated the express terms of the First Amended Scheduling Order.  *Id.* at 11–13 (Page ID #421–23).

In an opinion dated April 9, 2014, a panel of this court dissolved the injunction, holding that the district court lacked jurisdiction to enjoin the arbitration because the Arbitration Panel had yet to render a final award. *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 722 (6th Cir. 2014).

**4. After Meadowbrook unsuccessfully moves to disqualify Rosen, Greene and Rosen—over Schlaybaugh's dissent—issue a Final Award in National Union's favor.**

On May 20, 2014—about a month after we dissolved the district court's injunction—Meadowbrook filed with the Arbitration Panel a Motion to Disqualify Arbitrator Rosen and to Disband the Panel. R. 13-19 (5/20/14 Meadowbrook Mot. to Disqualify) (Page ID #895). The Arbitration Panel denied that motion over Schlaybaugh's dissent. R. 13-2 (Final Award, App., Ex. Y—6/19/14 Order) (Page ID #616).

The Arbitration Panel issued its Final Award on July 25, 2014. R. 13-2 (Final Award) (Page ID #503). The Final Award ordered Meadowbrook to pay National Union: (1) an additional $8,993,576.72, plus interest; (2) an as-yet-undetermined amount for Meadowbrook's overbilling in relation to three of its workers'-compensation programs; and (3) National Union's attorneys' fees and costs. *Id.* at 2 (Page ID #504).

Rosen and Greene attached a lengthy Appendix, containing twenty-six exhibits, to the Final Award. R. 13-2 (Final Award, App.) (Page ID #506). In the Appendix, they wrote that they were both "profoundly disturbed by Meadowbrook's attack on the reputations and integrity of Umpire Greene and Arbitrator Rosen," *id.* ¶ 1 (Page ID #506), and provided a detailed timeline of how the arbitration had unfolded. *Id.* ¶¶ 2–29 (Page ID #506–12). The Appendix also attempted to justify Rosen's August 7, 2013 ex parte contact with Moglin:

Furthermore, inasmuch as Meadowbrook's August 6, 2013, Paragraph 4 submission flew in the face of National Union's counsel's July 25, 2013 and August 5, 2013 emails . . . National Union was logically compelled to react, which given the circumstances, underpinned by Meadowbrook's flagrant discovery abuse, logically (and permissibly) required conferring with Arbitrator Rosen as a pre-cursor to bringing the Motion. That is entirely consistent with the motion protocol as respects *ex parte* communications that was ordered by the [Arbitration] Panel at the Organizational Meeting as well as Arbitrator Rosen's function and role as National Union's party appointed arbitrator, thus prompting Umpire Greene in his September 3, 2013, communication to the parties to note that the *ex parte* communication complained of "was **not inappropriate** and, indeed, is what I would have expected in the circumstances" . . . . As such, the [Arbitration] Panel majority remains steadfast in its rejection of Meadowbrook's allegations of improper behavior on Arbitrator Rosen's part.

*Id.* ¶ 28 (Page ID #512).

In dissent, Schlaybaugh argued that the Final Award had the effect of expanding Meadowbrook's liability from roughly $1.5 million (the amount National Union demanded in its Pre-Hearing Submission) to over $25 million. R. 31-26 (7/25/14 Schlaybaugh Dissent at 1) (Page ID #2045).

### 5. Meadowbrook moves to vacate the Interim Final Award and Final Award, and seeks to conduct discovery.

On July 25, 2014—the same day the Arbitration Panel issued the Final Award—Meadowbrook filed a new complaint in the United States District Court for the Eastern District of Michigan. R. 1 (7/25/14 Compl.) (Page ID #1). Meadowbrook urged the district court to vacate the Interim Final Award and the Final Award under Michigan Court Rule 3.602(J). *Id.* at 4 (Page ID #4). Meadowbrook asserted several grounds for vacating the Arbitration Panel's two awards, including (1) Rosen's ex parte contacts with Moglin and (2) Greene's and Rosen's disenfranchisement of Schlaybaugh. *Id.* at 4–22 (Page ID #4–22).

On August 20, 2014, National Union responded by filing both an Answer and a Motion to Confirm Arbitration Awards. R. 8 (Def.'s Answer) (Page ID #179); R. 12 (Mot. to Confirm)

(Page ID #438). In its confirmation motion, National Union requested that the district court order Meadowbrook to pay National Union $17,903,667.52—the balance that National Union alleged was outstanding under the Interim Final Award and Final Award. *Id.* at 25 (Page ID #472).

The following day, Meadowbrook filed a motion seeking leave to conduct expedited discovery. R. 16 (Mot. for Leave to Conduct Immediate, Expedited Disc.) (Page ID #1307). In a brief accompanying that motion, Meadowbrook requested that the district court hold in abeyance National Union's motion to confirm the Arbitration Panel's two awards. R. 16 (Br. in Support of Pltfs.' Mot. for Leave to Conduct Immediate, Expedited Disc. at 8) (Page ID #1319).

**6. The district court denies Meadowbrook's discovery motion and enters an order confirming in part the Interim Final Award and Final Award.**

On October 2, 2014, the district court issued an order denying Meadowbrook's request to conduct discovery (the "October 2, 2014 Order"). R. 27 (10/2/14 Order at 1) (Page ID #1651). Regarding Rosen's ex parte communications with Moglin, the district court concluded that Meadowbrook had "fail[ed] to allege specific instances of misconduct." *Id.* at 5 (Page ID #1655). Further, the district court read the Appendix to the Final Award as confirming that Rosen spoke with Moglin just once, and that Meadowbrook had not demonstrated that that lone communication was improper. *Id.* at 5–6 (Page ID #1655–56). As for Meadowbrook's claim that Greene and Rosen disenfranchised Schlaybaugh, the district court concluded that Meadowbrook had "fail[ed] to develop this argument." *Id.* at 6 (Page ID #1656).

On March 31, 2015, the district court issued an order granting in part National Union's motion to confirm the arbitration awards (the "March 31, 2015 Order"). R. 47 (3/31/15 Op. and Order at 19) (Page ID #4314). That order reiterated the conclusion that the district court reached

19

in its October 2, 2014 Order: Meadowbrook had failed to allege improprieties sufficient to vacate the Arbitration Panel's Interim Final Award or Final Award. *Id.* at 3–12 (Page ID #4298–307).

The district court did identify one error with the Arbitration Panel's Interim Final Award and Final Award: the Arbitration Panel had miscalculated the amount of prejudgment interest that Meadowbrook owed National Union. *Id.* at 13–14, 16–17 (Page ID #4308–09, 4311–12). The district court ordered the parties to return to arbitration in order to resolve any dispute over this issue. *Id.* at 14, 17 (Page ID #4309, 4312).

Meadowbrook filed its notice of appeal on April 3, 2015. R. 49 (Notice of Appeal) (Page ID #4317).

### 7. National Union unsuccessfully moves to amend the March 31, 2015 judgment under Rule 59(e)

On April 13, 2015, National Union filed a Rule 59(e) motion to amend the district court's March 31, 2015 judgment. R. 54 (4/13/15 Mot. to Amend) (Page ID #4421). In its accompanying brief, National Union argued that it was in fact entitled to recover more than the $17,903,667.52 it demanded in its motion to confirm. R. 54 (4/13/15 Br. in Support of Mot. to Amend at 2–3) (Page ID #4429–30). The *actual* amount of National Union's damages, the Rule 59(e) motion claimed, was $19,559,658.94. *Id.* at 2 (Page ID #4429). Meadowbrook subsequently filed a notice of cross-appeal from the March 31, 2015 judgment—which it styled "Defendant's Notice of Appeal"—on April 24, 2015. R. 57 (Def.'s Notice of Appeal) (Page ID #4499).

On January 27, 2016, the district court denied National Union's motion to amend in a written order (the "January 27, 2016 Order"). R. 69 (1/27/16 Order at 2) (Page ID #4652).

National Union filed an Amended Notice of Cross Appeal—in which National Union wrote that it was appealing the district court's January 27, 2016 Order and its March 31, 2015 judgment— on February 4, 2016. R. 70 (Def.'s Amend. Notice of Cross-Appeal at 2) (Page ID #4662).

## II. ANALYSIS

The procedural history of this case is complex, but at bottom the parties are challenging three district-court orders:

1. The *October 2, 2014 Order* denying Meadowbrook's discovery request. Meadowbrook challenges this order.

2. The *March 31, 2015 Order* confirming in part the Arbitration Panel's Interim Final Award and Final Award. Both Meadowbrook and National Union challenge this order.

3. The *January 27, 2016 Order* denying National Union's Rule 59(e) motion to amend the March 31, 2015 judgment. National Union challenges this order.

Our analysis begins and ends with the second of these orders. The district court erred when it refused to vacate the Arbitration Panel's Interim Final Award and Final Award, because Rosen's ex parte contacts with Moglin voided both awards. For that reason, we must reverse the district court's March 31, 2015 judgment, and vacate both of the Arbitration Panel's awards.

Meadowbrook identifies *seven* flaws with the March 31, 2015 Order. One is clearly meritorious: Meadowbrook argues that the district court should have vacated the Interim Final Award and Final Award because Rosen and Moglin communicated ex parte. We agree.

The Treaty provides—and the parties agree—that Michigan law governs this appeal. R. 31-17 (Treaty Art. 21) (Page ID #1942). We review de novo the district court's March 31, 2015 Order confirming in part the Interim Final Award and Final Award. *See, e.g.*, *City of Ann Arbor v. Am. Fed'n of State, Cty., & Muni. Employees (AFSCME) Local 369*, 771 N.W.2d 843, 854 (Mich. Ct. App. 2009). The scope of our review, however, "is narrowly circumscribed." *Id.* In

21

Michigan, "[j]udicial review of a binding arbitrator's award is strictly limited by statute and court rule." *Krist v. Krist*, 631 N.W.2d 53, 57 (Mich. Ct. App. 2001).

Michigan Court Rule 3.602(J) lists four conditions that void an arbitration award:

On motion of a party, the court *shall vacate* an award if:

(a) the award was procured by corruption, fraud, or other undue means;

(b) there was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights;

(c) the arbitrator exceeded his or her powers; or

(d) the arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights.

Mich. Ct. R. 3.602(J)(2) (emphasis added).

National Union and Meadowbrook appear to agree that our authority to vacate the district court's judgment confirming in part the Interim Final Award and Final Award derives from Rule 3.602(J). Meadowbrook Br. at 32; National Union Br. at 33, 66; *see also* R. 1 (7/25/14 Compl. at 4) (Page ID #4) (asking district court to vacate both awards pursuant to Rule 3.602(J)(2)(b)–(d)). Neither party, however, identifies which of Rule 3.602(J)'s enumerated grounds covers Meadowbrook's strongest argument: that Rosen's ex parte contacts with Moglin require us to vacate the Interim Final Award and Final Award.

We think that Rule 3.602(J)(2)(b)—under which a Michigan court will vacate an award if an arbitrator engaged in "misconduct prejudicing a party's rights"—most clearly encompasses such ex parte communications. *See Kerezsi v. Kerezsi*, No. 202876, 1999 WL 33446485, at *1 (Mich. Ct. App. Apr. 27, 1999) (identifying ex parte contact between party and arbitrator "regarding the subject matter of an arbitration award" as a form of "misconduct" that voids the

award).    Regardless of how we classify the ex parte contacts between Rosen and Moglin, however, Michigan case law makes plain that we must vacate the Arbitration Panel's two awards, because these ex parte contacts clearly violated the parties' scheduling orders.

To explain how we reach this conclusion, we start by examining Michigan law interpreting the effect of ex parte communications during an arbitration.  We then explain why the ex parte communications between Rosen and Moglin warrant reversal here.

### 1. In Michigan, ex parte contacts between a party and an arbitrator are grounds to vacate an arbitration award if those communications violate the parties' agreement to arbitrate.

Meadowbrook argues for a bright-line rule.  Relying on the Michigan Supreme Court's opinion in *Hewitt v. Village of Reed City*, 82 N.W. 616 (Mich. 1900), Meadowbrook argues that *any* ex parte contact between an arbitrator and a party while the arbitration is pending is grounds for vacating an arbitration award.  In the century-plus since *Hewitt* issued, Michigan courts have retreated from its apparently absolute ban on ex parte communications.  However, those courts have settled on a middle-ground position that supports Meadowbrook:  ex parte communications between a party and an arbitrator void an arbitration award if those communications violate the parties' arbitration agreement.

We begin with *Hewitt*.  Plaintiff Kate Hewitt injured herself while walking on a Village of Reed City sidewalk.  *Id.* at 616.  The parties entered into arbitration, and the arbitrator found for the village.  *Id.*  After the parties testified—but before the arbitrator rendered a decision—the village's president filed with the arbitrator "a memorandum of cases or authorities."  *Id.*  The Michigan Supreme Court concluded that that ex parte communication warranted vacating the arbitration award, without first inquiring into whether the communication had prejudiced Hewitt:

> The rule is very strict in excluding any communication to an arbitrator, made ex parte after the case is submitted; and when such communication, which may affect the result, is made, it is not usual to enter into an inquiry as to whether the arbitrator was in fact influenced by it or not.

*Id.*

Although *Hewitt* is an old case, the Michigan Supreme Court recently issued an order explicitly adopting *Hewitt*'s reasoning. *See Gates v. USA Jet Airlines, Inc.*, 756 N.W.2d 83 (Mem.) (Mich. 2008) (applying *Hewitt* and vacating arbitration award because party filed brief with arbitrators after parties put on proof, which violated "express rules" arbitrators had laid out before arbitration commenced)*, reversing Gates v. USA Jet Airlines, Inc.*, No. 272860, 2008 WL 314937 (Mich. Ct. App. Feb. 5, 2008).

After *Gates*, Michigan courts have refined *Hewitt*'s rule and taken the view that although ex parte communications between a party and an arbitrator may not categorically be grounds for vacating an arbitration award, such communications do void an award if they violate the parties' arbitration agreement. *See Cummings v. Cummings*, No. 318724, 2015 WL 2412470, at *5 (Mich. Ct. App. May 19, 2015) ("There is no rule that ex parte contact between an arbitrator and the parties requires that the award be vacated. . . . Rather, cases where the arbitration award was vacated due to ex parte communication involved a violation of the arbitration agreement prohibiting such conduct." (internal citation omitted)); *Cipriano v. Cipriano*, 808 N.W.2d 230, 236 (Mich. Ct. App. 2010) ("[T]he definitive question is not whether there is a bright-line rule but, rather, whether the ex parte contact violated the parties' arbitration agreement.").

### 2. Rosen's ex parte communications with Moglin violated the plain terms of the parties' two scheduling orders.

In light of this Michigan arbitration law, the question before us is narrow: did Rosen's ex parte contacts with Moglin violate the parties' agreement to arbitrate? We answer that question

24

"yes." At the August 1, 2012 organizational meeting, Meadowbrook and National Union agreed to terminate ex parte communications with the Arbitration Panel after filing pre-hearing briefs. The Arbitration Panel subsequently issued two scheduling orders that memorialized this deadline. Rosen's ex parte contacts with Moglin—which commenced one month after National Union filed its first pre-hearing brief—violated that deadline. The district court erred on the facts and the law when it held otherwise. As a result, we reverse the district court's March 31, 2015 judgment and vacate the Arbitration Panel's two awards.

Both the August 21, 2012 Scheduling Order and the March 11, 2013 First Amended Scheduling Order forbade the parties from communicating ex parte with the Arbitration Panel after filing their "initial pre-hearing briefs." National Union filed its initial pre-hearing brief on June 14, 2013. Rosen and Moglin communicated ex parte *three times* after June 14: once on July 23, 2013 (the day the Arbitration Panel issued its Interim Final Award); once on July 25, 2013; and again on August 7, 2013 (the day after Meadowbrook filed its supplemental brief pursuant to Paragraph Four of the Interim Final Award). Those ex parte communications clearly violated both scheduling orders.

National Union counters this conclusion by highlighting a gap in the scheduling orders: the orders stipulated when ex parte communications would *cease*, but never said when they could *resume*. Nat'l Union Br. at 48. In support of this interpretation, National Union relies on the justification that the Panel Majority—i.e., Greene and Rosen—provided in their Appendix to the Final Award: that in the reinsurance-arbitration field, "it is generally recognized and understood that once a panel issues a dispositive ruling on the merits of a matter following a hearing, absent a panel order to the contrary, the preclusion on *ex parte* communications ceases

and the parties are free to communicate with their appointed arbitrators." R. 13-2 (Final Award, App. ¶ 27) (Page ID #512).[3] Thus, National Union asserts that because "the Interim Final Award disposed of all issues of liability between the parties," it was "a ruling on the merits," and neither Rosen nor Moglin violated the scheduling orders when they communicated on (or after) the date that the Interim Final Award issued. Nat'l Union Br. at 49; *see also Duckert v. Duckert*, No. 239952, 2003 WL 22221387, at *1–*2 (Mich. Ct. App. Sept. 25, 2003) (rejecting defendants' claim that arbitrator's ex parte communications warranted vacating arbitration award because, unlike in *Hewitt*, there was no indication that arbitrator had ex parte contact with party before issuing final opinion).

There are at least three reasons why National Union's argument fails. First, National Union's reading of both scheduling orders is inconsistent with their plain language. Neither order was ambiguous: the Scheduling Order and First Amended Scheduling Order forbade the parties from communicating with the Arbitration Panel after submitting their first pre-hearing briefs. National Union violated that unequivocal ban on ex parte communications three times. Moreover, the parties and the Arbitration Panel—sophisticated businesspeople all, with extensive experience conducting reinsurance arbitrations—settled on this ban at *National Union's* urging. It was *Moglin* who insisted that Meadowbrook and National Union terminate all contact with the Arbitration Panel after the first briefs were filed. At bottom, the plain language of the Scheduling Order and First Amended Scheduling Order forecloses National Union's argument

---

[3]National Union's position on this issue conflicts with AIDA Reinsurance and Insurance Arbitration Society ("ARIAS") Rule 15.5, which provides that parties to a reinsurance arbitration should not communicate ex parte with the panel "until the [p]anel issues its *final award*." ARIAS, *U.S. Rules for the Resolution of U.S. Insurance and Reinsurance Disputes*, R. 15.5, https://www.arias-us.org/pdfs/arias-rules-final.pdf (emphasis added). National Union claims that Rule 15.5 was not in effect when the parties entered into arbitration in 2011, Nat'l Union Br. at 52–53, a fact Meadowbrook does not dispute. Meadowbrook Reply Br. at 13 n.9. Nonetheless, we agree with Meadowbrook that ARIAS Rule 15.5 belies National Union's claim that Rosen's ex parte contacts with Moglin comported with common practices in the reinsurance-arbitration field. Meadowbrook Br. at 37 n.13.

that ex parte communications could resume after the Arbitration Panel issued its Interim Final Award.

Second, National Union's claim that the Interim Final Award was a "final" merits ruling is at odds with the motivating intellectual impulse behind its briefing before us. National Union has consistently maintained that the *Interim* Final Award was just that. By National Union's logic, the Interim Final Award contemplated an inchoate form of relief, and thus Meadowbrook cannot claim unfair surprise over the fact that the *Final* Award appeared to increase, dramatically, its damages liability. As Schlaybaugh wrote in his August 30, 2013 dissent, the Interim Final Award left "critical issues" unresolved—issues, Schlaybaugh wrote, that "amplifie[d] why the initial Award was designated as 'Interim.'" R. 31-6 (8/30/13 Schlaybaugh Dissent at 3) (Page ID #1816). Indeed, this is the reason why this court dissolved the district court's injunction. We reasoned that the district court lacked jurisdiction to enjoin the arbitration in September 2013 because, at that point, the Arbitration Panel had issued only an Interim Final Award. *Savers Prop. & Cas. Ins. Co.*, 748 F.3d at 722. In reaching that conclusion, we recognized that in the absence of a final award, "the arbitration was not complete." *Id.* at 719.

Finally, although Greene and Rosen are certainly in a position to opine on standard operating procedures in reinsurance arbitrations, so is Schlaybaugh. And in his August 30, 3013 dissent, Schlaybaugh contended that Rosen *unequivocally* violated the scheduling orders when he communicated ex parte with Moglin. *Id.* at 1–4 (Page ID #1814–17). For all three reasons, National Union's reading of the scheduling orders' bans on ex parte contact lacks merit.

The district court's reasoning in its March 31, 2015 Order was just as problematic as National Union's justifications for these ex parte contacts. There, the district court cited *no*

Michigan cases assessing the effect of ex parte communications on an arbitration award. R. 47 (3/31/15 Op. and Order at 6) (Page ID #4301). Instead, the court cross-referenced its October 2, 2014 Order denying Meadowbrook's request to conduct discovery. *Id.* However, in this earlier order, the district court also did not cite *any* Michigan case law when it held that Meadowbrook could not conduct discovery into Rosen's ex parte communications with Moglin. R. 27 (10/2/14 Order at 4–6) (Page ID #1654–56).

Instead, in its October 2, 2014 Order, the district court denied Meadowbrook relief based on its conclusion that the Appendix to the Final Award exonerated Rosen. By the district court's reading, in the Appendix the Arbitration Panel majority—again, Greene and Rosen—stated that Rosen had had one innocuous ex parte communication with Moglin. *Id.* at 5–6 (Page ID #1655–56). Rosen, however, communicated ex parte with Moglin *at least three times*: once on July 23, 2013; again on July 25, 2013; and one final time on August 7, 2013. As Michigan law makes plain, the prejudicial effect *vel non* of those communications is irrelevant. Rosen and Moglin violated the scheduling orders, and as a result the district court should have vacated the Arbitration Panel's two awards. In reaching an opposite result, the district court erred on the law and erred on the facts.

We hold that because Moglin's ex parte communications with Rosen violated the plain terms of the parties' scheduling orders, Meadowbrook need not demonstrate prejudice for us to vacate the Arbitration Panel's two awards. Nonetheless, because National Union contends that "the *ex parte* communications had no direct, prejudicial impact as to substantive decisions at issue" in this case, National Union Br. at 51, we think it important to review briefly how the arbitration unfolded after the Arbitration Panel issued its Interim Final Award on July 23, 2013.

28

That day, Rosen and Moglin spoke ex parte in violation of both scheduling orders. They discussed the Interim Final Award. Two days later, they spoke again. And two weeks after that ex parte contact, when Meadowbrook filed its August 6 supplemental brief, Moglin and Rosen resumed their ex parte communications. Days later, Greene issued an order—taken *wholesale* from an email Rosen sent him—striking that supplemental brief, without first hearing from Meadowbrook's party arbitrator, Schlaybaugh. When Greene and Rosen issued a Final Award over Schlaybaugh's dissent about one year later, Meadowbrook found itself liable for millions more than it had anticipated when the arbitration commenced. Put simply, this was an arbitration in which "the coincidences all br[oke] one way." *Thomas Kinkade Co. v. White*, 711 F.3d 719, 720 (6th Cir. 2013).

In sum, Rosen's ex parte communications with Moglin violated the scheduling orders' explicit bans on ex parte communications. For that reason, we reverse the district court's March 31, 2015 judgment and vacate the Arbitration Panel's two awards.

## III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's March 31, 2015 judgment confirming in part the Arbitration Panel's Interim Final Award and Final Award and **VACATE** both awards.